UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAMES COTTER and WILSON LAND REALTY, LLC,

|                          | Plaintiffs, |
| --- | --- |

Index No. 09-2347

-against-

**FIRST AMENDED
COMPLAINT**

NEWARK HOUSING AUTHORITY,

Defendant.

Plaintiffs James Cotter and Wilson Land Realty LLC, as and for their complaint

herein against defendant Newark Housing Authority, hereby respectfully allege as follows:

## PARTIES

1.      Plaintiff James Cotter ("Cotter") is a resident of the State of New York,

residing at 11 Harvard Street, Garden City, New York.

2.      Plaintiff Wilson Land Realty, LLC ("Wilson") is a New Jersey limited

liability company.  Cotter is the sole member of Wilson.

3.      Defendant Newark Housing Authority ("NHA"), formerly known as The

Housing Authority of the City of Newark, is a public body corporate of the State of New Jersey

the address of which is 500 Broad Street, Newark, New Jersey.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, in

that it is a dispute between citizens of different states and the amount in controversy exceeds

$75,000.  For jurisdictional purposes, a limited liability company is considered a citizen of the state where its member(s) reside(s).

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

## FACTS COMMON TO ALL CAUSES OF ACTION

6.      NHA was the owner of approximately 44 acres of land (the "44 acres") in Newark, New Jersey.  NHA had designated Industrial Land Urban Renewal, Inc. ("ILUR") to develop that property.  The sole shareholders of ILUR were Cotter, the plaintiff herein, and Richard DeVino ("DeVino").

7.      Part of those 44 acres was 30 acres (the "30 acres") of real property known as Disposal Parcel 46BR in NJR-121 located at Block 5020, Lots 69.03, 69.04, 69.05 and 69.06, with an address of 411-443 Wilson Avenue, Newark, New Jersey.  This property is adjacent to and parallel to the N.J. Turnpike just south of Exit 15E.

8.      On or before 1992, ILUR commenced an action entitled Industrial Land Urban Renewal, Inc. v. Newark Redevelopment and Housing Authority, Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C478-89, by which ILUR asserted it had the right to acquire the 44 acres.

9.      On July 16, 1992, NHA and ILUR entered into a Stipulation of Settlement pursuant to which ILUR was granted the right of first refusal to acquire from NHA the 30 acres (Lots 69.03, 69.04, 69.05 and 69.06).  That Stipulation of Settlement was recorded in Book 5351, Page 0435, et seq., in the Essex County Clerk's Office.

10.     In 1995, ILUR purchased from NHA approximately 14 acres of the 44 acres (located at Block 5020, Lots 69.01 and 92.02).  This property is adjacent to, but is not part of, the 30 acres that were subject to ILUR's right of first refusal discussed above.  Thus, by the end of 1995, of the 44 acres,  ILUR owned 14 acres and had a right of first refusal over 30 acres.

11.     While the 14 acres acquired had road access, the remaining 30 acres could be accessed only by traversing the 14 acres.  As such, the 14 acres were known as the "front" acres and the 30 acres as the "back" acres.

**The Cotter-ILUR Lawsuit**

12.     In January 1998, Cotter brought suit against DeVino and ILUR in the Superior Court of New Jersey, Chancery Division, Essex County, entitled <u>James Cotter</u> v. <u>Richard DeVino, et ano</u>., Docket No. C-29-98, over a disagreement that had erupted between Cotter and DeVino over ILUR's development of the 14 acres (Lots 69.01 and 92.02), as well as the 30 acres over which ILUR had the right of first refusal (Lots 69.03, 69.04, 69.05 and 69.06).

13.     That litigation was concluded by a court-ordered Stipulation of Settlement dated June 6, 2001.  Exhibit 1.  Pursuant to that Stipulation of Settlement, ILUR's right of first refusal to purchase the 30 acres (Lots 69.03, 69.04, 69.05 and 69.06) was conveyed to Cotter. Specifically, Paragraph 2 of that Stipulation of Settlement provides:

> "DeVino and ILUR assign to Cotter, or such entity which he may form, all right, title and interest in and to a right of first refusal for purchase of property designated as Disposition Parcel 48BR, consisting of approximately 30 acres, all as more particularly set forth in Paragraph 6 of a Stipulation of Settlement dated July 16, 1992 entered in a matter entitled <u>Industrial Land Urban Renewal, Inc</u>. v. <u>Newark Redevelopment and Housing Authority</u>, Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C478-89,

recorded in Book 5351, Page 0435 <u>et</u> <u>seq</u>. in the Essex County Clerk's Office (the 'NHA Settlement')."

14.     As part of that settlement, and in exchange for the right of first refusal, Cotter was required to relinquish, and in fact did relinquish, his 50% ownership interest in ILUR, and as a result his interest in ILUR's ownership of the front 14 acres.

15.     In addition, paragraph 4 of the Stipulation of Settlement required that ILUR convey to NHA easement access over the front 14 acres to provide road access to the back 30 acres:

> "***ILUR shall convey to the NHA two easements*** entitling the NHA and its successors and assigns to use the access road denoted as Road 'C' on Exhibit 'B' annexed hereto constructed by DeVino and ILUR shown on the plan prepared by George R. Pronesti, PLS, dated October 4, 1999 and accompanying legal description, a copy of which is annexed hereto as Exhibit 'A' and extend the road on the westerly side denoted as Road 'A' which is 31.22' wide through ILUR's property, as a means of ingress and egress and under which to install, if necessary, underground utilities, at the expense of the NHA and its successors and assigns, ***to facilitate access to and from and development of the 30 acre parcel referenced in Paragraph 6 of the NHA Settlement referenced in Paragraph 2 hereinabove***."[1]

16.     Paragraph 11 of the Stipulation of Settlement required that NHA approve paragraphs 4 and 8 thereof:

> "***Subject to formal approval by the Newark Housing Authority of the terms contained in paragraphs 4 through 8***, by way of separate Agreement, the within action shall be dismissed with prejudice and without costs."

---

[1]   Unless otherwise indicated, emphasis is added throughout this complaint.

4

17.    Although the NHA was not a party to that lawsuit, NHA approved paragraphs 4 and 8 of the Stipulation of Settlement.

**NHA Offers To Sell To Cotter**

18.    Before that Stipulation of Settlement was finalized, but after it became apparent that ILUR would relinquish its right of first refusal over the back 30 acres (Lots 69.03, 69.04, 69.05 and 69.06) to Cotter as part of a settlement, NHA informed Cotter that it was willing to sell to Cotter 22 of the 30 acres consisting of Lots 69.04, 69.05 and 69.06.

19.    By letter dated January 10, 2001 (Exhibit 2), NHA advised Cotter's counsel:

"The Authority will sell up to twenty-two (22) acres to Cotter.  We request that Cotter give us an offer to purchase.  The final price will have to be approved by a reuse appraisal performed by appraisers retained by the Authority pursuant to the requirements of the HUD urban renewal disposition guidelines . . . .

The eight (8) acres currently being used by T. Fiore and any other land that is not acquired by Cotter, will be released from the Right of First Refusal."

Thereafter, NHA had the 22 acres at issue appraised at $113,000 per acre, for a total appraised value of $2,486,000.

20.    By letter dated March 15, 2001 (Exhibit 3), NHA's counsel advised Cotter's counsel:

"***The Authority is willing to convey the '22 acres' to your client which is located on the northern end of the property in question for the total price of $2,486,000***.  The property will be conveyed 'as is' as a cash sale.  We will give you a reasonable time period to conduct your due diligence with respect to this land.  The Authority will not be amenable to a reduction in the purchase price based on the investigation.  Your client must commit to the construction of a 40,000 square foot building within two years of the date of closing.  It must execute the standard HUD Disposition Agreement applicable to urban renewal land."

While NHA stated in this letter and elsewhere that it was giving Cotter a reasonable time period to conduct due diligence with respect to this property, as discussed below, thereafter NHA prevented and interfered with those efforts.

       21.    NHA conditioned its sale of the 22 acres at Lots 69.04, 69.05 and 69.06 to Cotter on Cotter giving up his right of first refusal over the remainder of the 30 acres at Lot 69.03 of Block 5020.  Upon information and belief, NHA imposed this condition as it was in NHA's interest to sell Lot 69.03 to T. Fiore Recycling ("Fiore"), which was assisting NHA in the demolition of housing projects in Newark and which was already leasing that Lot from NHA for storage of materials from those demolition activities.  In addition, Fiore used that site to operate a Class B recycling operation.

       22.    NHA's March 15, 2001 (Exhibit 3) letter to Cotter's counsel provided:

"So as not to interfere with the attempted resolution of the dispute between Mr. DeVino and Mr. Cotter, we propose that you obtain a release from Industrial Land Urban Renewal Corp. of its right of first refusal with respect to the land which you are acquiring.  ***Further, we request that the land currently leased to T. Fiore be released from the 'right of first refusal.'***  We will agree to the modification of the easements across the land which we conveyed to ILUR to reflect the desires of Mr. DeVino in this regard."

       23.    By letter dated June 1, 2001 (Exhibit 4), Cotter's counsel advised NHA as follows:

"I have put in one paper the agreement that has been reached between our clients which provides as follows:

  1.  Cotter will have right to enter the property for testing and surveying (but not to occupy) for a period of time not to exceed six (6) months.

  2.  Cotter will purchase all of the remaining 22 acres upon the following terms and conditions:

      a) purchase price of $113,000 per acre
      b) 15% down payment
      c) NHA will hold 10 year self-liquidating mortgage at Prime plus 1%.
         Interest will be adjusted on each annual anniversary.  Cotter shall
         execute a mortgage, note and assignment of rents.

    3.  Cotter, DeVino & ILUR will waive any rights to the remaining 8 acres of
the Back 30 acres [Lot 69.03]."

        24.     In a letter dated June 4, 2001 (Exhibit 5), NHA advised Cotter's counsel that,

"[s]ubject to final approval by the Authority's Board of Commissioners, the Authority will enter

into a contract with Cotter to sell 22 acres of land located on Wilson Avenue, City of Newark,

for $113,000 per acre."  The 22 acres referred to in that letter were Lots 69.04, 69.05 and 69.06.

This letter continued with the requirement that Cotter relinquish his right of first refusal over

Lot 69.03:  "As a condition to this agreement . . . . Cotter, DeVino and ILUR will wave [sic]

their rights of first refusal of land leased by the Authority to T. Fiore."

        25.     NHA's June 4, 2001 letter (Exhibit 5) continued:  "Mr. Cotter will have six

months from the date of the execution of the contract to perform due diligence with respect to

the property, including, but not limited to, environmental testing."  NHA interfered with,

frustrated and prevented these due diligence and environmental testing activities.

        26.     Cotter agreed in principle to release Lot 69.03 from his right of first refusal as

part of an overall agreement in which NHA would convey Lots 69.04, 69.05 and 69.06 to

Cotter, and allow Cotter an adequate period of due diligence and environmental testing.

Thereafter, NHA sold Lot 69.03 to Fiore which operates a class B recycling facility on that site.

        27.     Earlier, NHA had leased Lots 69.04, 69.05 to 69.06 to Fiore.  After June 4,

2001, and with NHA's permission, Fiore stored large quantities of recycled soils, demolition

debris and other materials on that property.  The quantities of dirt, debris and stone that Fiore stored on the property amounted to hundreds of thousands of yards approaching 50 to 60 feet in height.  This debris has been stored, and continues to be stored, both on the lot that Fiore owns as well as the adjoining 22 acres that he leases from NHA.

28.     Thereafter, Cotter's acquisition of Lots 69.04, 69.05 to 69.06 was stymied because Fiore's use of those 22 acres, as permitted by NHA, impeded Cotter's ability to complete the required due diligence and environmental testing on that property.  NHA, as the owner of those 22 acres, can be found liable for any clean-up or environmental remediation necessitated by Fiore's use thereof.

29.     By letter dated January 27, 2003 (Exhibit 6), Cotter's counsel complained to NHA concerning the debris that Fiore had piled on Lots 69.04, 69.05 and 69.06:

> "I was stunned to learn that Newark Housing Authority (NHA) has apparently breached the terms of the Settlement Agreement with my client.  ***Mr. Cotter and the surveyor went out to the property to inspect the property in order for the surveyor to provide a metes and bounds description of the easements to attach to the contract to purchase as you had previously requested.  They found a 20 foot high pile of ground up brick and other items.***  Fiore informed them that he has a lease with the NHA and that they were trespassing.
>
> This is a NOTICE THAT YOU ARE TO IMMEDIATELY TERMINATE the lease which is permitting foreign materials of unknown origin to be placed on the property and that may very well be creating environmental problems that shall necessitate an environmental cleanup."

30.     By letter dated February 20, 2003 (Exhibit 7), NHA terminated Fiore's lease to Lots 69.04, 69.05 and 69.06 effective thirty days later.  Upon information and belief, Fiore refused to vacate and NHA took no steps to enforce the termination of his lease.

31.     On February 26, 2004, the NHA Board of Commissioners passed resolution 04-02-26-17 (Exhibit 8) which authorized NHA to enter into a Disposition Agreement with plaintiff Wilson Land Realty, LLC (a company owned by Cotter) to convey the above referenced 22 acres of land, consisting of Lots 69.04, 69.05 and 69.06, based upon the previously negotiated price of $2,490,000.

32.     By letter dated March 17, 2004 (Exhibit 9), NHA confirmed to Cotter's counsel that the NHA Board of Commissioners approved the sale of Lots 69.04, 69.05 and 69.06 to Cotter for a price of $2,490,000:

> "The Newark Housing Authority (NHA) Board of Commissioners has approved the above referenced sale [of Lots 69.04, 69.05 and 69.06].
>
> Furthermore, we had previously negotiated an agreement with your client, James Cotter, whereby the Authority would convey the subject land consisting of approximately 22 acres for a price of $2,490,000.  The terms of sale were a 15% down payment with a 10-year purchase money mortgage at prime plus 1% interest."

The letter continued:

> "At this time, the NHA is requiring that if your client has a continued interest in this property, it must close on or before May 1, 2004.  Please advise me before the close of business on April 15, 2004 if your client desires to acquire this property in its current condition based upon the terms and conditions of our proposed agreement.
>
> Also, attached for your client's signing is the contract for said property.  We are making this matter a time of the essence closing effective May 1, 2004.  If we do not hear from you by April 15, 2004 of your intentions to close, we will assume that Mr. Cotter has no further interest in the property."

33.     The March 17, 2004 letter did not state a time or place for closing.

Moreover, the date of May 1, 2004 set for closing was unreasonable in light of the parties' prior

agreement that Cotter would have a reasonable time to conduct due diligence and the fact that NHA was interfering with that due diligence process.  In addition, NHA acted unreasonably in setting a May 1, 2004 closing date as it had not yet finalized and recorded the easement needed for access to Lots 69.04, 69.05 and 69.06, which was required for closing.

34.    By letter dated April 13, 2004 (Exhibit 10), Cotter's counsel confirmed Cotter's willingness to close on Cotter's purchase of Lots 69.04, 69.05 and 69.06 but advised:

> "My client will of course be ready to close May 1, 2004 as he was ready to close February 1, 2004 pursuant to the NHA resolution.  However, the contract as I mentioned in our last conversation, is NOT reflective of the resolution.  I have made the requisite changes and enclose a copy.  Please review and advise."

35.    In response, upon information and belief, NHA did not execute that contract provided by Cotter.  Nevertheless, NHA and Cotter, as well as other parties involved in granting the required easement, continued to proceed to consummate Cotter's acquisition.

36.    By letter dated January 10, 2005 (Exhibit 11), Cotter's counsel provided NHA a list of items that needed to be resolved "to clear the title issues and schedule the closing."  Among the items listed was "[t]he removal of the contaminated dirt that T. Fiore has permitted to be dumped on the property."  That dirt and debris had by then grown to approximately 100,000 yards covering most of 30 acres.

37.    By letter dated September 19, 2005 to NHA (Exhibit 12), Cotter's counsel noted that the New Jersey Department of Environmental Protection ("DEP") advised that the continued environmental review of Lots 69.04, 69.05 and 69.06 was being delayed by the

extensive piles of materials that Fiore had stored on that site.  That letter demanded:  "I am formally requesting that you begin the process to have those piles of material removed."

38.     Cotter's counsel thereafter made additional requests that the debris be removed from the site.

39.     To obtain permanent access for usage of Lots 69.04, 69.05 and 69.06 from Wilson Avenue following their sale, an easement was required over land owned by ILUR. Counsel for NHA, Cotter, ILUR and Fiore worked on that easement over many months.  On July 13, 2005, that easement (Exhibit 13) was filed with the Essex County Register after execution by all parties.

40.     In reliance on NHA's words and actions, Cotter and his agents repeatedly entered the site pursuant to authorization by NHA for the purpose of surveying and environmental testing.  Such testing is required by all purchasers of industrial land and if environment laws and procedures are not followed the seller can be found liable for clean-up and environmental matters.

41.     Cotter has spent approximately $200,000 preparing for the closing of his acquisition of the property in reliance upon the settlement agreement and the NHA Resolution. This work has included extensive surveys, plotting a secondary road, drafting easements which have been executed by Fiore, ILUR and NHA and have been recorded, a Phase I report prepared by TSA Environmental which is 75 pages in length, the preparation of a Preliminary Assessment by Cilli Environmental and soil and water testing by Conestoga Rovers & Associates.

42.     Cotter provided to NHA copies of all of the environmental test reports on the property including tests on the piles of dirt that have been deposited by Fiore.  New Jersey DEP has requested additional soil testing throughout the 22 acres including extensive areas of the land covered by dirt.   Those tests cannot be completed currently due to the debris Fiore has piled in these Lots which has grown to cover the entire site.

43.     Although Cotter has not entered into a formal contract, he has relied on the court ordered Stipulation of Settlement, the Resolution of NHA and the other promises and actions of NHA.

44.     By letter dated June 25, 2008, Cotter's counsel requested a meeting with NHA to discuss proceeding to closing.  By letter dated July 22, 2008, NHA advised that Cotter's counsel should contact NHA's outside counsel to discuss.  Thereafter, Cotter's counsel made efforts to meet with NHA's counsel, who failed to respond.  Months later, NHA's counsel did telephone Cotter's counsel and acknowledge that the accumulation of debris on the property, and related environmental concerns, continued to be an impediment to closing.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach Of Contract)

45.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 44 above.

46.     By virtue of the foregoing, plaintiffs have a binding contract with NHA pursuant to which NHA is obligated to sell Lots 69.04, 69.05 and 69.06 to plaintiffs for $2,490,000.

47.     Defendant has refused to honor its contractual obligations.

48.     As such, plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Specific Performance)

49.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 48 above.

50.     The property at issue is unique.

51.     As such, plaintiffs are entitled to a decree of specific performance ordering NHA to convey the property to plaintiffs for $2,490,000 and ordering that NHA remove the debris piled on the property in order to allow the completion of environmental testing prior to closing.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Promissory Estoppel)

52.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 51 above.

53.     In letters dated January 10, 2001, March 15, 2001, June 4, 2001, and March 17, 2004, and in the February 26, 2004 resolution, the NHA promised to sell plaintiffs Lots 69.04, 69.05 and 69.06, and to allow plaintiffs a period of due diligence and environmental testing with respect to those lots.

54.     These promises were made to plaintiffs with the expectation on the NHA's part that plaintiffs would rely upon them.

55.     As a result of NHA's promises, and in reliance upon those promises, plaintiffs released Lot 69.03 from the right of first refusal, surveyed and conducted environmental testing on Lots 69.04, 69.05 and 69.06, and negotiated, drafted and recorded easements.

56.     Plaintiffs' reliance on the NHA's promises resulted in a definite and substantial detriment to plaintiffs in that they released Lot 69.03 from the right of first refusal and Lot 69.03 was thereafter sold by the NHA to Fiore, and in that they spent approximately $200,000 preparing for the closing of their acquisition of the property.

57.     As such, plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Equitable Estoppel)

58.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 57 above.

59.     In letters dated January 10, 2001, March 15, 2001, June 4, 2001, and March 17, 2004, and in the February 26, 2004 resolution, the NHA represented that the condition of Lots 69.04, 69.05 and 69.06 was adequate to permit plaintiffs to conduct due diligence and environmental testing with respect to those lots.

60.     These representations were made to plaintiffs with the expectation on the NHA's part that plaintiffs would rely upon them.

61.     At the time of making the representations, the NHA had actual knowledge of the true facts, which were that Fiore had stored and continued to store large quantities of recycled soils, demolition debris and other materials on Lots 69.04, 69.05 and 69.06, and that

the condition of those lots was not adequate to permit plaintiffs to complete due diligence and environmental testing with respect to those lots.

62.     As a result of NHA's representations, and in reliance upon those representations, plaintiffs released Lot 69.03 from the right of first refusal, surveyed and conducted environmental testing on Lots 69.04, 69.05 and 69.06, and negotiated, drafted and recorded easements.

63.     Plaintiffs' reliance on the NHA's representations resulted in a definite and substantial detriment to plaintiffs in that they released Lot 69.03 from the right of first refusal and Lot 69.03 was thereafter sold by the NHA to Fiore, and in that they spent approximately $200,000 preparing for the closing of their acquisition of the property.

64.     As such, plaintiffs are entitled to an award of compensatory damages in an amount to be determined at trial.

WHEREFORE, plaintiffs are entitled to judgment as follows:

1.     On their first cause of action, awarding them compensatory damages in an amount to be proven at trial;

2.     On their second cause of action, entering a decree of specific performance ordering the defendant NHA to convey the property to plaintiffs for a price of $2,490,000 and ordering that NHA remove the debris piled on the property in order to allow the completion of environmental testing prior to closing;

3.     On their third cause of action, awarding them compensatory damages in an amount to be proven at trial;

4.      On their fourth cause of action, awarding them compensatory damages in an amount to be proven at trial;

5.      Awarding plaintiff punitive damages to the maximum extent permitted by law;

6.      Awarding plaintiffs pre-judgment interest;

7.      On all causes of action, awarding plaintiffs their attorneys' fees, expenses, disbursements and costs in bringing this proceeding; and

8.      Granting plaintiffs such other and further relief as this Court may deem just and proper.

CHADBOURNE & PARKE LLP

By      _____*s/ Thomas J. Hall*_____
                    Thomas J. Hall
                    A Member of the Firm
              Attorneys for Plaintiffs
              30 Rockefeller Plaza
              New York, New York  10112
              (212) 408-5100

# EXHIBIT 1



STERN GREENBERG & KILCULLEN
75 Livingston Avenue
Roseland, New Jersey 07068
(201) 535-1900
Attorneys for Defendant

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: ESSEX COUNTY
DOCKET NO.: C-29-98

JAMES COTTER

          Plaintiff,

    vs.

RICHARD DEVINO and INDUSTRY
LAND URBAN RENEWAL CORP-
ORATION, a New Jersey Corporation

         Defendants.

Civil Action

**STIPULATION OF SETTLEMENT**



FILED
JUN 6 2001
HON. R. BENJAMIN COHEN, P.J.Ch.

**IT IS HEREBY STIPULATED AND AGREED** by James Cotter, residing at 11

Harvard Street, Garden City, New York 11530 ("Cotter"), Richard Devino, having an

address of 337 Jefferson Street, Newark, New Jersey 07102  ("Devino"), and Industry

Land Urban Renewal, Inc.,  a New Jersey Corporation, having offices at 337 Jefferson

Street, Newark, New Jersey 07102, ("ILUR") as follows:

    1.      Cotter dismisses and releases all claims asserted or which could have been

asserted against Devino and ILUR alleging an interest in ILUR as an officer, director

1

and/or shareholder. Devino and ILUR dismisses and releases all claims asserted or which could have been asserted against Cotter arising from his involvement with ILUR.

2.    Devino and ILUR assign to Cotter, or such entity which he may form, all right, title and interest in and to a right of first refusal for purchase of property designated as Disposition Parcel 48BR, consisting of approximately 30 acres, all as more particularly set forth in Paragraph 6 of a Stipulation of Settlement dated July 16, 1992 entered in a matter entitled Industry Land Urban Renewal, Inc. v. Newark Redevelopment and Housing Authority, Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C478-89, recorded in Book 5351, Page 0435 et seq. in the Essex County Clerk's Office (the "NHA Settlement").

3.    Devino and ILUR shall pay Cotter the total sum of $50,000 as follows:

(a)    $25,000 upon execution of this Stipulation of Settlement payable to the Bette R. Grayson Attorney Trust Account, to be held in escrow pending approval by the Newark Housing Authority ("NHA") of the terms contained in Paragraphs 4 through 8 by way of separate Agreement;

(b)    $25,000 upon receipt by ILUR and Devino of all governmental approvals from City's Planning Board and/or Zoning Board required for construction of

2

its proposed building on the 14.6 acre tract conveyed to ILUR in a Deed dated February 2, 1995 by the NHA, recorded in Book 5353, Page 0099 et seq. in the Essex County Clerk's Office; it being understood that if ILUR and Devino are unable to obtain such approvals because of the non-compliance with valid requirements of such agencies, that shall not constitute a basis for non-payment;

(c)     Cotter agrees that he shall not directly or indirectly interfere or cause interference by others with any governmental approvals that ILUR and Devino are required to obtain for construction of its proposed building on the 14.6 acre tract.

4.     ILUR shall convey to the NHA two easements entitling the NHA and its successors and assigns to use the access road denoted as Road "C" on Exhibit "B" annexed hereto constructed by Devino and ILUR shown on a plan prepared by George R. Pronesti, PLS, dated October 4, 1999 and accompanying legal description, a copy of which is annexed hereto as Exhibit "A", and extend the road on the westerly sideline denoted as Road "A" which is 31.22' wide through ILUR's property, as a means of ingress and egress and under which to install, if necessary, underground utilities, at the expense of the NHA and its successors and assigns, to facilitate access to and from and development of the 30 acre parcel referenced in Paragraph 6 of the NHA Settlement referenced in Paragraph 2 hereinabove;

5.     In consideration for the easement referenced in Paragraph 4 hereinabove, the NHA shall surrender all right, title and interest in and to the access road described in the NHA Settlement and waives all contractual restrictions and restrictions of record with respect to said easement including those contained in the Deed dated February 2, 1995, the NHA Settlement and any contracts between the NHA and ILUR and/or Devino governing development of the aforesaid 14.6 acre tract conveyed to ILUR; and the NHA further waives all rights it holds by way of deed restriction, contract, stipulation of settlement or otherwise requiring its consent and approval to the building proposed by ILUR on its 14.6 acre tract and to such application(s) and plans submitted and/or to be submitted by ILUR and Devino to the Newark Central Planning Board and such other governmental bodies whose approval may be necessary for construction of the building proposed by ILUR on said 14.6 acre tract.

6.     Devino and ILUR withdraw all objections to pending or subsequent applications by the NHA seeking final subdivision approval for the aforesaid 30 acre parcel.

7.     Devino and ILUR shall have the right, at their option, to transfer title in the 14.6 acre tract to another entity, provided that Devino retains control in said entity; and said transfer, if made, shall not be deemed by the NHA as a violation of or default in the provisions of any mortgage, contract, stipulation of settlement including, but not

limited, to the NHA Settlement and this Stipulation of Settlement, or any other obligations.

8.    The parties agree to execute any and all documents and do any and all acts necessary in furtherance of the terms of this settlement;

9.    Devino and ILUR agree to indemnify and to hold Cotter harmless with respect to any and all actions and/or omissions, whether known or unknown, by Devino and/or ILUR, or their agents, arising out of ownership of the 14.6 acre tract and operation of ILUR; and Cotter agrees to indemnify and to hold Devino and ILUR harmless with respect to any and all actions and/or omissions, whether known or unknown, by Cotter, or his agents, relating to the 14.6 acre tract.

10.    Except as to the obligations contained herein, the parties mutually release each other from any and all claims asserted or which could have been asserted against the other, it being the parties' intention that this shall constitute a general reciprocal release.

11.    Subject to formal approval by the Newark Housing Authority of the terms contained in Paragraphs 4 through 8, by way of separate Agreement, the within action shall be dismissed with prejudice and without costs.

WITNESS:

_____

_____
Bette R. Grayson, Esq.
Attorney for James Cotter

WITNESS:

_____

_____
James Cotter

Dated: _6/6/01_____

WITNESS:

STERN GREENBERG & KILCULLEN
Attorneys for Richard Devino and
Industry Land Urban Renewal, Inc.

_____

By: _____
Howard D. Cohen

WITNESS:

_____

_____
Richard Devino

WITNESS:

INDUSTRY LAND URBAN RENEWAL, INC.

_____

By: _____
Richard Devino, President

Dated: _6/6/201_____

Devino/Cotter - Stipulation of Settlement  6/6/01



# PRONESTI
## SURVEYING, INC.
### PROFESSIONAL LAND SURVEYORS

425 POMPTON AVENUE
CEDAR GROVE, NJ 07009

TEL: (973) 857-3319
FAX: (973) 857-3608

**DESCRIPTION**
OF
**PROPOSED NEW ROADWAY**
**THROUGH LOT 69.01 IN BLOCK 5020**
**KNOWN AS 411 WILSON AVENUE**
**CITY OF NEWARK**
**ESSEX COUNTY NEW JERSEY**

**BEGINNING** at a point in the easterly sideline of Lot 69.01 in Block 5020 as shown on the City of Newark Tax Maps said point being the following courses from a point distant 320.00 feet measured at right angles to the left of Station 5593+65.00, 1969 Turnpike Widening Baseline And Continuous Stationing Baseline of The New Jersey Turnpike; running thence

a) Along said sideline of Lot 69.01 South 00 degrees 29 minutes 54 seconds East, 21.08 feet to an angle point; thence

b) North 43 degrees 11 minutes 37 seconds West, along the southerly side of said lot 69.01, 12.13 feet to an angle point in same; thence

c) Still along the said southerly side of Lot 69.01 North 65 degrees 34 minutes 10 seconds West, 298.51 feet to the **POINT OF BEGINNING,** thence running

1) Along the aforesaid southerly sideline of Lot 69.01 North 65 degrees 34 minutes 10 seconds West, 60.42 feet to a point; thence

2) Through said lot 69.01, North 31 degrees 10 minutes 50 seconds East, along the westerly sideline of a new roadway, 358.00 feet to an angle point in same; thence

3) Still along the westerly sideline of a new roadway North 26 degrees 42 minutes 59 seconds East, 426.09 feet to a point in the northerly sideline of said lot 69.01; thence

4) Along said northerly sideline South 71 degrees 03 minutes 42 seconds East, 60.56 feet to a point; thence

5) Again through said lot 69.01, South 26 degrees 42 minutes 59 seconds West, along the easterly sideline of a new roadway 436.62 feet to an angle point in same; thence

(continued)

6) Still along the easterly sideline of said new roadway South 31 degrees 10 minutes 50 seconds West, 353.24 feet to the aforesaid southerly sideline of Lot 69.01 in Block 5020 and **POINT AND PLACE OF BEGINNING.**

The above described Parcel Contains 47,218 Square feet or 1.084 Acres of Land.

The above description prepared in accordance with a survey made by **Pronesti Surveying, Inc., Professional Land Surveyors, dated October 4, 1999.**

George R. Pronesti, P.L.S.

12/15/2000  15:37   516488941   FLOWERVIEWGDS   PAGE  B7



Exhibit "B"

# EXHIBIT 2

ILUR



ROBERT GRAHAM
EXECUTIVE DIRECTOR

January 10, 2001

COMMISSIONERS
ZINNERFORD SMITH
CHAIRPERSON
IDA CLARK
VICE-CHAIRPERSON
GLORIA CARTWRIGHT
TREASURER

FRANK ADUBATO
DONALD BRADLEY
NORMA GONZALEZ
LYNELL ROBINSON

**Bette Rita Grayson, Esq.**
**140 Mountain Avenue**
**P.O. Box 95**
**Springfield, NJ 07081**

**Re: Proposed Agreement regarding land on Wilson Avenue. ILUR, DeVino, and Cotter.**

**Dear Ms. Grayson:**

The Authority has reviewed your proposed agreement regarding the disposition of the 44 acres on Wilson Avenue which was the subject of a prior Settlement Agreement in litigation between Industrial Land Urban Renewal Corp. ("ILUR") and the Housing Authority. The Authority has determined that the proposal is not in its best interest and therefore must be rejected. We make the following counter-proposal:

1. The Authority will sell up to twenty-two (22) acres to Cotter. We request that Cotter give us an offer to purchase. The final price will have to be approved by a reuse appraisal performed by appraisers retained by the Authority pursuant to the requirements of the HUD urban renewal disposition guidelines. Cotter will be required to develop the property pursuant to the Authority's standard urban renewal disposition contract. We will require that a building or buildings of no less than to 15% of the total land to be acquired be constructed on the property within two years of the date of closing on the sale. The sale will be subject to the standard urban renewal reverter provision if this development is not pursued.

2. The eight (8) acres currently being used by T. Fiore and any other land that is not acquired by Cotter, will be released from the Right of First Refusal.

3. We will accept the revised easement proposed by ILUR as long as it allows access to the easement designated on the approved subdivision map. (That subdivision was approved by the Central Planning Board on January 8, 2001.)

4. The Authority will excuse ILUR's delay in developing the 14.6 acre tract in accordance with the requirements of the settlement and the disposition agreement. The Authority will require ILUR to comply with its obligation to develop buildings on the property with a square footage of at least 15% of the land acquired by ILUR from the Authority (95,396 sq. ft.) The Authority will not object to the current application of ILUR before the Planning Board with the understanding that it is part of a total development plan.

57 Sussex Avenue · Newark, New Jersey 07103 · (973)430-2430 · Fax (973)642-1242
"Building Quality Housing and Inspiring the Human Spirit"

Bette Grayson, Esq.
Page 2; January 10, 2001

5.    ILUR will submit a proposal to the Authority and the Central Planning Board for the
      development of the required facility of at least 95,396 square feet within six months
      of the date of the agreement.  Said development will have to be commenced within
      one year of the date of this agreement and constructed within two years of the date
      of this agreement.  If ILUR fails to comply with any of these requirements the
      Authority will have the right to exercise its reverter rights with respect to the
      property.

6.    The Authority will not waive its responsibility under HUD Guidelines to approve the
      final development to ensure that it complies with all of the requirements of the Urban
      Renewal Plan and the Disposition Agreement.  The Authority will provide a
      Certificate of Completion that will release ILUR from the reverter clause and the
      limits on conveying the property upon completion of the entire development required
      under the contract.  This is subject to continuing compliance with the requirements
      of the purchase money mortgage between ILUR and the Authority.

7.    The Authority will consider reasonable requests for the transfer of the interests of
      ILUR or Cotter to affiliate entities, provided full disclosure of the ownership interest
      in the proposed assignee is provided.

Please review the above with the representatives of ILUR and DeVino and inform me if the
proposal is acceptable.  If you have any questions, please contact me.

Very truly yours,

Frank L. Armour
General Counsel

cc:    Zinnerford Smith
       Robert Graham
       Joseph Bianco

FA:

# EXHIBIT 3

03/19/01  MON 12:36 FAX 9739120540         BETTE R GRAYSON                        ☐002

FROM : NHA                        FAX NO. :4302188              Mar. 19 2001 11:05PM  P2



ROBERT GRAHAM
EXECUTIVE DIRECTOR

**March 15, 2001**

**VIA FAX**

COMMISSIONERS
ZINNERFORD SMITH
CHAIRPERSON
IDA CLARK
VICE-CHAIRPERSON
GLORIA CARTWRIGHT
TREASURER

FRAN ACUBATO
DONALD BRADLEY
NOTHA GONZALEZ
LYNELL ROBINSON

Bette Rita Grayson, Esq.
140 Mountain Avenue
P.O. Box 95
Springfield, NJ 07081

Re:    Proposed Agreement regarding land on Wilson Avenue,
       ILUR, DeVino, and Cotter.

Dear Ms. Grayson:

          This is in response to your letter of March 6, 2001 and Mr. Giantomasi's letter of February 22, 2001. Be advised that the Authority has carefully reviewed the proposals and we believe that the matter can be resolved to the satisfaction of all parties. The Authority is willing to convey the "22 acres" to your client which is located on the northern end of the property in question for the total price of $2,486,000. The property will be conveyed "as is" as a cash sale. We will give you a reasonable time period to conduct your due diligence with respect to this land. The Authority will not be amenable to a reduction in the purchase price based on the investigation. Your client must commit to the construction of a 40,000 square foot building within two years of the date of closing. It must execute the Standard HUD Disposition Agreement applicable to urban renewal land.

          We are not in agreement with the proposal of Mr. Giantomasi regarding the modification of his client's redevelopment agreement. We particularly take exception to the provision reducing the size of the building to be developed to 27,500 square feet of building. There is no consideration for this reduction of the size of the building and for the Authority's waiver of other rights contained in the Disposition Agreement between the Authority and ILUR.

          So as to not interfere with the attempted resolution of the dispute between Mr. DeVino and Mr. Cotter, we propose that you obtain a release from Industrial Land Urban Renewal Corp. of its right of first refusal with respect to the land which you are acquiring. Further, we request that the land currently leased to T. Fiore be released from the "right of first refusal." We will agree to the modification of the easements across the land which we conveyed to ILUR to reflect the desires of Mr. DeVino in this regard.

          By copy of this letter, I am advising Mr. Giantomasi of our position in this matter. Please advise me as soon as possible as to whether the above arrangement is satisfactory to your client and I.L.U.R. If so please prepare the necessary documents to memorialize the arrangement.

57 Sussex Avenue · Newark, New Jersey 07103· (973)430-2430· Fax (973)642-1242
"Building Quality Housing and Inspiring the Human Spirit"

FROM :NHA                          FAX NO. :4302188           Mar. 19 2001 11:05PM  P3

**Bette Grayson**
**March 15, 2001; Page 2.**

If you have any questions, please contact me.

Very truly yours,

Frank L. Armour
**General Counsel**

cc:    **Frank Giantomasi, Esq.**
       **Zinnerford Smith**
       **Robert Graham**
       **Joseph Bianco**
       **Oliver Lofton, Esq.**

**FA:**

# EXHIBIT 4

05/31/2012  14:06  9739120540   BETTEGRAYSONESQ   PAGE  02/03

# BETTE RITA GRAYSON

### ATTORNEYS AT LAW
#### 140 MOUNTAIN AVENUE
#### P.O. BOX 75
#### SPRINGFIELD, NEW JERSEY 07081

ROSA CONTI
N.J. BAR
CHARLES E. MURRAY, III
N.J. & N.Y. BARS

(973) 467-4040
FAX (973) 912-0540

June 1, 2001

VIA FAX AND MAIL
Frank Armour, Esq.
Newark Housing Authority
57 Sussex Avenue
Newark, New Jersey

RE:  James Cotter v. Richard Devino, et al.
Back 30 Acres

Dear Frank:

I have put in one paper the agreement that has been reached between our clients which provides as follows:

1.    Cotter will have right to enter the property for testing and surveying (but not to occupy) for a period of time not to exceed six (6) months.

2.    Cotter will purchase all of the remaining 22 acres upon the following terms and conditions:

    a)    Purchase price of $113,000 per acre
    b)    15% down payment
    c)    NHA will hold 10 year self-liquidating mortgage at Prime plus 1%.  Interest rate will be adjusted on each annual anniversary.  Cotter shall execute a mortgage, note and assignments of rents.

3.    Cotter, Devino & ILUR will waive any rights to the remaining 8 acres of the Back 30 acres.

4.    Cotter shall have the right to approve any arrangement or agreement with the pipeline company respecting its easement.

5.    Cotter shall not:

05/31/2012  14:06     9739120540          BETTEGRAYSONESQ                    PAGE  03/03

a)   Place anything higher than one container within
     100 feet of the NHA property
b)   Go higher than 40 feet on the remainder of
     the property.

6.   Cotter must construct a 40,000 sq. ft. building within
thirty (30) months of closing title.


Please review and advise as soon as possible.


Sincerely yours,


BETTE R. GRAYSON, ESQ.

BRG/ca
Cc:  James Cotter

a:\ca-31\cotter3.ltr

# EXHIBIT 5

06/03/2012  12:35    9739120540                    BETTEGRAYSONESQ                    PAGE  02/03
FROM :NHA                          FAX NO. :4302188                Jun. 04 2001 12:11PM P2



**Robert Graham**
*Executive Director*

June 4, 2001

**COMMISSIONERS**
**Zinnerford Smith**
   *Chairperson*
**Ida Clark**
   *Vice-Chairperson*
**Gloria Cartwright**
   *Treasurer*

**Fran Adubato**
**Donald Bradley**
**Norma Gonzalez**
**Lynell Robinson**

Ms. Bette Rita Grayson, Esq.
140 Mountain Avenue
P.O. Box 75
Springfield, New Jersey 07081

Re: James Cotter/Richard DeVino
    Sale of Land 22 Acres-407 Wilson Avenue

Dear Ms. Grayson:

This is to confirm our discussion of May 31, 2001. Subject to final approval by the Authority's Board of Commissioners, the Authority will enter into a contract with Cotter to sell 22 acres of land located on Wilson Avenue, City of Newark, for $113,000 per acre.

The terms of the sale will be 15% down payment and the Authority will give an adjustable rate purchase money mortgage at prime rate plus 1% for the balance of the contract price. The mortgage interest rate will be determined each year on January 1st. The term of the mortgage will be 10 years and it will be self-liquidating.

Mr. Cotter will have six months from the date of the execution of the contract to perform due diligence with respect to the property, including, but not limited to, environmental testing. A time of the essence of closing must occur within six months of the execution of the contract. If the closing does not occur within that time, the Contract of Sale will terminate and the Authority will have unencumbered rights to the property, and free of all rights of first refusal.

The deed will contain restrictions on the use of the property limiting the height that the owner may stack trailers or containers. Trailers or containers may not be stacked more than 10 feet high within 100 ft. of any land owned by the Authority. Further, containers or trailers may not be stacked higher than 40 ft. any place on the premises. This shall be subject to any other restrictions regarding use of premises imposed by the City of Newark.

05/03/2012  12:35   9739120540   BETTEGRAYSONESQ   PAGE  03/03
FROM :NHA                    FAX NO. :4302188              Jun. 04 2001 12:11PM  P3

-Page 2-

Ms. Bette Rita Grayson, Esq.

As a condition to this agreement, DeVino and Industrial
Land Urban Renewal (ILUR) will wave their right of first refusal
with respect to the land sold to Cotter under this agreement.
Cotter, DeVino and ILUR will wave their rights of first refusal of
land leased by the Authority to T. Fiore.   The Authority will
modify its agreement with ILUR reducing the area of the structure
they must develop to 40,000 square feet.   Further, Cotter will
commit to construct a 40,000 square foot building within two years
of closing.

The standard HUD Contract of Sale of Land will be executed by
the parties according to HUD regulations. Cotter will submit the
HUD required financial disclosure statement prior to Board of
Commissioners approval of agreement.

If this agreement is acceptable, please advise me as soon as
possible.

Very truly yours,

Frank Armour
General Counsel

FA:gd

c:   Zinnerford Smith
     Robert Graham
     Jimmy Miller
     Joseph Bianco

# EXHIBIT 6

# GRAYSON AND ASSOCIATES, L.L.C.

### ATTORNEYS AT LAW
### 140 MOUNTAIN AVENUE
### P.O. BOX 75
### SPRINGFIELD, NEW JERSEY 07081

**BETTE RITA GRAYSON**
N.J. BAR
**ROSA CONTI**
N.J. BAR
**JOANNA D. BRICK**
N.J. & N.Y. BARS

(973) 467-4040
FAX (973) 912-0540
FAX (973) 258-0778

January 27, 2003

<u>VIA FACSIMILE AND MAIL</u>
Frank Armour
Legal Department
Newark Housing Authority
57 Sussex Avenue
Newark, New Jersey 07105

RE: Cotter Urban Renewal, LLC

Dear Mr. Armour,

I was stunned to learn that Newark Housing Authority (NHA) has apparently breached the terms of the Settlement Agreement with my client. Mr. Cotter and the surveyor went out to the property to inspect the property in order for the surveyor to provide a metes and bounds description of the easements to attach to the contract to purchase as you had previously requested. They found a 20 foot high pile of ground up brick and other items. Fiore informed them that he has a lease with the NHA and that they were trespassing.

This is a NOTICE THAT YOU ARE TO IMMEDIATELY TERMINATE the lease which is permitting foreign materials of unknown origin to be placed on the property and that may very well be creating environmental problems that shall necessitate an environmental cleanup.

As the authority seems to be permitting the property to be used as an illegal transfer station for building materials, the authority is also violating the State statutes which is clearly applicable to the NHA.

Please state immediately what the situation is as to the reported lease of the premises is and how the property

is being used as an illegal transfer station.  I request
that a meeting then be scheduled with NHA to clarify the
situation and to schedule a timetable for the surveying and
environmental testing.

Sincerely yours,

BETTE R. GRAYSON, ESQ.

BRG/ca
Cc:  James Cotter

a:\ca-46\cotter.ltr

# EXHIBIT 7



HAROLD LUCAS, ESQ.
EXECUTIVE DIRECTOR

February 20, 2003

COMMISSIONERS
ZINNERFORD SMITH
CHAIRMAN
IDA CLARK
VICE CHAIRPERSON
GLORIA L. CARTWRIGHT
TREASURER

FRAN ADUBATO
DONALD BRADLEY
LYNELL ROBINSON

Mr. Anthony F. Malanga, Jr., Esq.
Gaccione, Pomaco & Beck, Esq.
524 Union Avenue
P.O. Box 96
Belleville, New Jersey 07109

     Re:    Lease Between The Housing Authority Of The City Of Newark And
            T. Fiore Demolition, Inc.

Dear Mr. Malanga:

    In July 2002, the Authority leased your client T. Fiore approximately eight (8) acres located adjacent to land that was previously occupied by T. Fiore. Said lease was for a period of six (6) months. The lease how now expired and the Authority desires that T. Fiore vacate the property as soon as possible because it needs the land for other purposes. Therefore, T. Fiore is given thirty (30) days notice to vacate the property and remove all stored property there from.

    If you have any questions, please contact me.

                 Very truly yours,

                 Frank Armour
                 General Counsel

FA:gd

c:    Harold Lucas
     Zinnerford Smith
     Joseph Bianco

# EXHIBIT 8

Board Meeting Date _2/26/04_  **RESOLUTION OF**
**THE HOUSING AUTHORITY OF THE CITY OF NEWARK**

**RESOLUTION NO.** _04-02-26-17_

**RESOLUTION AUTHORIZING THE EXECUTION OF A DISPOSITION AGREEMENT WITH WILSON LAND REALTY LLC, 809 SEACLIFF ROAD, OCEAN CITY, NJ TO CONVEY 22 ACRES OF LAND KNOWN AS BLOCK 5020, LOTS 69.04, 69.05, & 69.06, IN URBAN RENEWAL PROJECT R-21, LOCATED AT 411-443 WILSON AVENUE, FOR A TOTAL PRICE OF $2,490,633, WITH PAYMENT CONSISTING OF A DOWN PAYMENT OF $373,594.95 AND A PURCHASE MONEY 10 YEAR MORTGAGE AT PRIME RATE PLUS 1% GRANTED BY THE AUTHORITY IN THE PRINCIPAL AMOUNT OF $2,117,039.**

Factual Contents certified  Approved for Legality based on facts stated:  Approved

by:                                                                         
                        **General Counsel**                       **Contracting Officer**

Commissioner _Clark_    submitted the following resolution:

**WHEREAS**, the Authority entered into a settlement agreement with Industrial Land Urban Renewal Corp. (ILUR") whereby ILUR was granted a right to acquire approximately 30 acres of land known as Disposal Parcel 46BR in NJR-121 located at 411-443 Wilson Avenue ("the Property"), and

**WHEREAS**, litigation arose among the owners of ILUR regarding their respective rights to the assets of said Corporation; and

**WHEREAS**, the parties to said litigation entered into a stipulation whereby James Cotter, owner of Wilson Land Realty, LLC, 809 Seacliff Road, Ocean City, NJ would be assigned ILUR.'s right to acquire the aforesaid Property; and

**WHEREAS**, the Authority has negotiated an agreement ("Agreement") whereby the Authority will convey a portion of Disposal Parcel BR (Tax Lots 69.04 through 69.06) to an entity owned by Cotter ("the Redeveloper") for the appraised value of $113,000 per acre for a total payment of $2,490,633; and

**WHEREAS**, a part of the Agreement, will receive a cash payment of $373,594.95 and additional compensation in the form of a purchase money 10 year mortgage at a prime rate plus 1% in principal amount of $2,117,039. The interest rate shall be adjusted annually on January 1 of each year based on the prime rate of Chase Manhattan Bank or its successor in interest; and

**WHEREAS**, the Redeveloper is required to submit a Statement for Public Disclosure and A Statement of Redeveloper's Qualifications and Financial Responsibility as required by HUD pursuant to Section 105 and the Housing Act of 1949; and

**WHEREAS**, the Authority may designate the Redeveloper pursuant to HUD Guidelines which authorize redevelopment authorities to negotiate an Agreement for the Sale of Land for Private Redevelopment; and

**WHEREAS**, the Authority will issue a public notice of its intention to authorize said disposition agreement as well as advising that the Redeveloper's Statement of Qualifications and Financial Responsibility Part II shall be available for public examination along with the form of the disposition Agreement;

## NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE HOUSING AUTHORITY OF THE CITY OF NEWARK:

1. That the execution of Agreement for the sale between the Authority and Redeveloper with respect to 22,041 acres of land known as Disposal Parcel 48 Part in NJR-121 and as Block 5020, Lots 69.04 through 69.06 is authorized.

2. That said agreement shall be approved by the General Counsel.

3. That the Chairman, or in his absence Vice Chairperson, is authorized to execute all documents necessary to effectuate the transaction, and the Executive Director is authorized and directed to attest said documents.

4. That the Agreement shall require the Redeveloper to deposit a good faith deposit of $10,000.

5. That a disposition price of $2,490,633 ($113,000 per acre) based on appraisals received by the Authority in accordance with HUD regulations authorizing sale of redevelopment property for private development for a price not less that its fair reuse is proclaimed and authorized.

6. That compensation shall be made by a cash payment of $373,594.95 and a grant by the Authority of a 10-year self-liquidating purchase money mortgage at prime rate plus 1%, re-determined each January 1 by the prime rate of the Chase Manhattan Bank or its successor in interest.

7. That conveyance by bargain and sale deed, covenant against grantor's rights, pursuant to the above terms is authorized.

8. That this resolution shall take effect immediately.

Commissioner _Cartwright_ seconded the motion.

### BOARD OF COMMISSIONERS VOTE OF FINAL PASSAGE
X - Indicates Vote      AB - Absent      NV - Not Voting

| COMMISSIONERS | AYE | NAY | NV | AB | COMMISSIONERS | AYE | NAY | NV | AB |
|---|---|---|---|---|---|---|---|---|---|
| SMITH | X | | | | BRADLEY | X | | | |
| CLARK | X | | | | ROBINSON | X | | | |
| CARTWRIGHT | X | | | | | | | | |
| ADUBATO | | | | X | | | | | |

I hereby Certify that the above resolution was adopted at a Commissioners Meeting of the Housing Authority of the City of Newark, NJ on _2/26/04_ .

_____
Executive Director/Secretary

# EXHIBIT 9



HAROLD LUCAS, ESQ.
EXECUTIVE DIRECTOR

COMMISSIONERS
ZINNERFORD SMITH
*CHAIRMAN*
IDA CLARK
*VICE CHAIRPERSON*
GLORIA L. CARTWRIGHT
*TREASURER*

FRAN ADUBATO
DONALD BRADLEY
LYNELL ROBINSON

March 17, 2004

Bette Grayson, Esq.
140 Mountain Avenue
P.O. Box 75
Springfield, NJ 07081

**Re: James Cotter**
**409 Wilson Avenue, Rear**
**Urban Renewal, R121**
**Block 5020; Lots 69:04, 69:05 and Lot 69.06**

Dear Ms. Grayson:

The Newark Housing Authority (NHA) Board of Commissioners has approved the above referenced sale.

Furthermore, we had previously negotiated an agreement with your client, James Cotter, whereby the Authority would convey the subject land consisting of approximately 22 acres for a price of $2,490,000. The terms of sale were a 15% down payment and a 10-year purchase money mortgage at prime plus 1% interest.

After due deliberation, the NHA has decided to complete its final urban renewal matters and close this program out. This parcel is one of the remaining few that must be closed as soon as possible. At this time, the NHA is requiring that if your client has a continued interest in this property it must close on or before May 1, 2004. Please advise me before the close of business on April 15, 2004 if your client desires to acquire this property in its current condition based upon the terms and conditions of our proposed agreement.

Also, attached for your client's signing is the contract for said property. We are making this matter a time of the essence closing effective May 1, 2004. If we do not hear from you by April 15, 2004 of your intentions to close, we will assume that Mr. Cotter has no further interest in the property.

Very Truly Yours,

Harold Lucas

C. Zinnerford Smith

57 Sussex Avenue • Newark, New Jersey 07103-3992 • Tel. 973-430-2430 • Fax 973-642-1242
*"IMPROVING NEWARK'S NEIGHBORHOODS"*

# EXHIBIT 10

## GRAYSON AND ASSOCIATES, L.L.C.

ATTORNEYS AT LAW
140 MOUNTAIN AVENUE
P.O. BOX 75
SPRINGFIELD, NEW JERSEY 07081

BETTE RITA GRAYSON
N.J. BAR
ROSA CONTI
N.J. BAR
JOANNA D. BRICK
N.J. & N.Y. BARS

(973) 467-4040
FAX (973) 912-0540
FAX (973) 258-0778

April 13, 2004

**VIA FACSIMILE (973-273-6546) & REGULAR MAIL**
Elio Mena
Newark Housing Authority
Law Department
500 Broad Street
Newark, New Jersey 07102

RE: Cotter Urban Renewal from Newark Housing Authority

Dear Mr. Mena:

My client will of course be ready to close May 1, 2004 as he was ready to close February 1, 2004 pursuant to the NHA resolution. However, the contract as I mentioned in our last conversation, is NOT reflective of the resolution. I have made the requisite changes and enclose a copy. Please review and advise.

Also, I need to finish the Title Company with a copy of the proposed Easement. I will also prepare that and fax to you by the end of the week. May 1st is a Saturday and I will not return from my daughter's college graduation in Michigan until Monday evening of May 3, 2004. Therefore, may we schedule for the afternoon of the 4th?

Please feel free to contact me regarding any questions.

Very truly yours,

Bette R. Grayson, Esq.

BRG/cds
Enclosure
cc: James Cotter
a:/cds-21/cotter.ltr

# EXHIBIT 11

# GRAYSON AND ASSOCIATES, L.L.C.
### ATTORNEYS AT LAW
140 MOUNTAIN AVENUE
P.O. BOX 75
SPRINGFIELD, NEW JERSEY 07081

BETTE RITA GRAYSON
N.J. BAR
ROSA CONTI
N.J. BAR
JOANNA D. BRICK
N.J. & N.Y. BARS

(973) 467-4040
FAX (973) 912-0540
FAX (973) 258-0778

January 10, 2005

Harold Lucas
Newark Housing Authority
500 Broad Street
Newark, New Jersey 07102

RE:   Industry Land Urban Renewal
Hyatt Avenue, Block 5020, Lots 69.04, 69.05 and 69.06

Dear Mr. Lucas:

In order to clear the title issues a`d schedule the closing, we need the following:

1.   Deed from Housing Authority to include all of their rights reserved by said Authority on and to a Right of Way granted to Central Railroad over Lot 100, Block 5020 as shown on Filed Map No. 4170 and should also grant an Easement for Ingress and Egress over Tract II.   **(See copy attached).**

2.   Housing Authority has to release its right, title and interest to the prior access road and Industry Land will then have to execute an Ingress and Egress Easement for the new Easement as per the road actually constructed by Devino.

3.   Housing Authority approval of the building Industry Land has previously submitted.   Frank Armour had refused to approve the building as it was to be constructed upon the Authority's Easement.

4.   The removal of the contaminated dirt that T. Fiore has permitted to be dumped on the property.

5.   Central Railroad's consent to cross over Right of Way Crossing over Tract No. 2 of Subdivision Map No. 4170.

6.   Copy of the Maintenance Agreement and terms and conditions between property owners for use of Private Road as show on Filed Map No. 4170.

I also enclosed a copy of the title work and proposed Easement.  Said Easement also requires Industry Land's approval which Frank has obtained contingent upon the Housing Authority approval of their plans.

Please review and advise.

Sincerely yours,

BETTE R. GRAYSON, ESQ.

BRG/ca
Cc:  Francis Giantomasi, Esq. (via lawyer service)
     Alfred Faiella (via lawyer service)
     James Cotter (via fax and mail)

a:\ca-67\cotter.ltr

# EXHIBIT 12

# GRAYSON AND ASSOCIATES, L.L.C.
### ATTORNEYS AT LAW
140 MOUNTAIN AVENUE
P.O. BOX 75
SPRINGFIELD, NEW JERSEY 07081

**BETTE RITA GRAYSON**
N.J. BAR
**ROSA CONTI**
N.J. BAR
**JOANNA D. BRICK**
N.J. & N.Y. BARS

(973) 467-4040
FAX (973) 912-0540
FAX (973) 258-0778

September 19, 2005

**VIA FACSIMILE AND LAWYER'S SERVICE**
Joseph Bianco,
Director of Redevelopment
57 Sussex Avenue
Newark, New Jersey 07103

> RE:  **409-411 Wilson Avenue**
> **Newark, New Jersey**
> **Block 5020, Lots, 69.04, 69.05, 69.06**

Dear Mr. Bianco:

I am enclosing correspondence received by my co-counsel, Alfred L. Faiella, Esq., for the New Jersey Department of Environmental Protection (NJDEP). I believe you had received a copy at an earlier date. The bureau has stated that the continued review by the DEP for environmental approvals will be delayed by the extensive piles of materials at the site.

I am formally requesting that you begin the process to have those piles of material removed. As you may recall, prior studies supplied to you have show T. Fiori's materials to have unacceptable levels of lead contamination and cannot be used as additional fill at the site.

A Memorandum of Agreement (MOA) and Preliminary Assessment Site Investigation (PASI) documents have been received the case manager, Gary Charyak, who has been assigned to the matter. It is our hope to work with him towards receiving a No Further Action letter, which will afford protection to both the agency and my client, Mr. Cotter.

1

Please keep me advised of the time table for the removal of the materials and we will keep you informed of the status with NJ DEP.

Sincerely yours,

BETTE R. GRAYSON, ESQ.

BRG/ca
Cc:   James Cotter
      Len Cilli
      Alfred Faiella, Esq.

a:\ca-79\cotter.ltr

# EXHIBIT 13



Prepared by:

Betty Grayson, Esq.

## EASEMENT AGREEMENT

This Easement Agreement ("Agreement") is made as of the 23d  day of  June  , 2005, among

the **Housing Authority of the City of Newark** ("Agency"), a public body corporate of the State of New

Jersey,

Whose address is 500 Broad Street, Newark, New Jersey 07102, and

**Industry Land Urban Renewal Corporation** ("I.L.U.R."), a corporation of the State of New Jersey,

Whose address is;  c/o Francis Giantomasi Esq., 292 Lafayette Street, Newark, New Jersey 07105,.

### RECITALS

A.     **Agency** was previously the owner of certain property in the City of Newark known as

Block 5020, Lot 69.01 and Agency is currently the owner of adjoining properties in the City of Newark

known as Block  5020, Lots 69.03, 69.04, 69.05 and 69.06. **Agency** conveyed Lot 69.01 to **I.L.U.R.**

along with the right to traverse Block 5020 and Lots 92.02 for access to said property and the adjoining

lots 69.03, 69.04, 69.05 and 69.06, out and through to the public roadway known as Wilson Avenue.

Agency has previously caused a private roadway to be placed of record, traversing and covering the

above referenced properties. **Agency** and **I.L.U.R.** now wish to record this EASEMENT AGREEMENT

to set forth the rights of the parties, their successors, assigns and interests for utilization and access of the

sixty foot (60') private roadway and the thirty foot (30') access easement (description attached hereto)

and provide for certain rights and a new alignment to said Easement and it is now the desire of the parties

to establish those mutual rights and responsibilities.



Instr#     5100523          Carole A. Graves
Recorded/Filed   RB    1     Essex County Register
07/13/2005  12:49:3 Bk 6206   Pg 792 #Pgs 30

| | | | |
|---|---|---|---|
| Consideration: | 0.00 | | R |
| County: | 0.00 | | |
| State: | 0.00 | | |
| N.P.R.F.: | 0.00 | | |
| Realty Tax: | 0.00 | | |
| Fees: | 320.00 | GP Fee: | 0.00 |

**NOW THEREFORE,** in consideration of the mutual covenants contained herein, and One dollar ($1.00) in hand, paid by each of the parties to the others, and for all the good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties enter this Agreement for the purpose of granting certain Easements and entering into certain understandings for the benefit of the parties and their successors and assigns and hereby agree as follows:

<div align="center">

ARTICLE I

DEFINITIONS

</div>

1.1  Definitions.

"Access Road" means the strip of land which is labeled as the "Private Roadway" on the survey and more particularly described by metes and bounds on Exhibit A attached to this Agreement.

"Benefited Party" means the party having the right to possession of any specific Benefited Property and the Permittees of such party.

"Benefited Property" means the dominant tenement with respect to a specific easement.

"Burdened Party" means the party having the right to possession of any specific Burdened Property and the Permittees of such party.

"Burdened Property" means the servient tenement with respect to a specific easement.

"Easement for Construction and Restoration" means the right granted to the designated Benefited Party allowing such Benefited Party, its architects, contractors, subcontractors, materialmen and others engaged in performing construction or

<div align="center">2</div>

construction-related work to use a designated portion, component or element of the Burdened Property for the purpose of performing construction work on or for the benefit of the Benefited Property, including the right to move materials, equipment and personnel involved in such work on and through the Burdened Property, the right to relocate utility lines, and the right to temporarily restrict access to such portions of the Burdened Property as may be reasonably required to conduct such work safely. In the event the Benefited Party desires to undertake construction with respect to the Benefited Property or desires to make alterations to the Benefited Property, the Benefited Party shall have the right to use the Burdened Property for or in connection with such work, provided such use does not unreasonably interfere with the Burdened Party's use of the Burdened Property.

"Easement Area" means, for any easement hereby granted, the area with respect to which such easement is granted.

"Impositions" means (a) all taxes, including (without limitation), (i) property taxes; (ii) sales, transaction privilege, license, excise, rent or similar taxes whether imposed on the rent, additional charges or other payments required to be paid by the parties hereto or their lessors under their respective leases for their respective properties, if any, by reason of (1) the privilege of renting or (2) the parties' occupancy under such leases, or (3) measured by the rent, additional charges, or other payments in such leases provided to be paid by the parties, and (iii) all new taxes imposed, levied or charges in lieu of or in addition to existing taxes by virtue of present or future law or governmental authority in connection with the ownership, use, occupancy or possession of any of the Properties as measured by the rents, additional charges or other payments provided to be paid by the respective parties under their respective leases, (b) assessments, including (without limitation), all assessments for public improvements or benefits, whether or not

3

commenced or completed prior to the date hereof and whether or not to be completed with the term hereof), (c) ground rents, contract payments, water, sewer, utility or similar rents, rates and charges, excises, levies, license fees, permit fees, inspection fees and other authorization fees, other charges and other governmental impositions in each case, whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every kind and character (including all interests and penalties thereon), which at any time during or in respect of the term hereof may be or become a lien upon, any such Property, or any part thereof, or any rents received with respect thereto, or in respect to the occupancy, use or possession of any activity conducted on or in such Property.

"Maintaining" or "Maintenance" (and all of its verb forms, regardless of whether or not capitalized) means any and all of the following if and to the extent applicable: landscaping, removal of snow and ice, lawn mowing, removal of rubbish, repair, replacement, upkeep (including, but not limited to, cleaning, washing, painting, decorating and inspecting) as may be necessary to keep the area in question in aesthetically pleasing, clean lawful, good, safe and sound condition and order.

"Non-Exclusive Easement" means an easement granted to the Benefited Party for use in common with the Burdened Party, its Permittees, and such third parties as the Burdened Party may designate from time to time.  The Burdened Party shall be entitled to grant additional easements, or other rights, to third parties with respect to an Easement Area burdened by a Non-Exclusive Easement without the prior approval of the Benefited Party, provided such grant to third parties does not materially and adversely effect the use and enjoyment of such easement by the Benefited Party and is not contrary to the terms and conditions of this Agreement.

"Permittees" means all persons who have been granted the right to enter a portion of any Property by the party thereof and shall include all tenants, subtenants and licensees

4

having a right to occupy such portion and their respective partners, officers, employees,

agents, contractors, subcontractors, materialmen, patrons, guests and other invitees.

"Property" or "Properties" means Lots 92.01, 69.01, 69.03, 69.04, 69.05 and

69.06 of Block 5020, city of Newark, Essex county, New Jersey, or one or more of them,

as the context shall require.

"Protected Mortgage" means a mortgage held by a protected Mortgagee.

"Protected Mortgagee" means any savings and loan association, commercial or

savings bank, trust company, credit union, insurance company, mortgage banking or

service company, pension fund, governmental or quasi-governmental agency or

instrumentality, public or private entity substantially engaged in the regular business of

mortgage lending or real estate investment trust, in each case whether holding the

mortgage for its own account or as trustee or agent for others, and any former owner

holding a purchase money mortgage made in connection with a bona fide sale by such

former owner of the Property secured, holding a mortgage upon any Property or any

portion thereof or interest therein.

"Service and Utility Lines" means all lines, pipes, conduits, ducts, cables and

wires providing service to the Property, on any portion thereof, including without

limitation, any service for or relating to a communication system (including telephone,

telex, computer, intercom or closed circuit television systems, whether involving

electrical wiring, fiber optics conduit or otherwise), sprinkler or other similar fire

systems, sanitary and storm sewer systems, water, cable television, electric, gas, steam

and/or heating systems, and any technological evolution of the foregoing or technological

addition thereto.

"Subdivision Plan" means that certain plan of Major Subdivisions dated July 19, 2000 and July 17, 2001, prepared by Professional Planning and Engineering Corporation ("PPE"), as said plan may be amended from time to time with the prior written consent of the owners of the Properties.

"Survey" shall mean that certain land Survey entitled Topographic Boundary Survey, dated December 22, 2004, prepared by David H. Smith, Professional Land Surveyor and attached to this Agreement as Exhibit B.

"Taking" means the exercise of the power of eminent domain or condemnation by any sovereign, municipality or other public or private authority.

<div align="center">

ARTICLE II

GRANTS OF EASEMENT

</div>

2.1 Easement for Use of the Access Road.

(a) **Agency** and **I.L.U.R.** hereby grant to the Properties a Non-Exclusive Easement in, on and over the Access Road, such easements for the purposes of pedestrian and vehicular access, ingress and egress between the Properties and Wilson Avenue and for emergency access, installation, maintenance, repair and replacement of the Access Road, Service and Utility Lines, as well as signage, curb cuts, and such other improvements within the said easement area as will be reasonably necessary for the use and enjoyment of the Properties.

Parking within the Access Road shall be prohibited and no parking rights within the Access Road are intended to be granted hereto. **Agency** and **I.L.U.R.** hereby acknowledge that the use of the Access Road pursuant to this Agreement is intended to be as a private road and not as a public right-of-way and that **Agency** and **I.L.U.R.** will take appropriate action with action with the City Clerk of the City of Newark to subject

<div align="center">6</div>

the Access Road to the provisions of Subtitle 1, Title 39 of the Revised Statutes of New Jersey.

(b) **Agency** and **I.L.U.R.** hereby grant to the owners of the Properties, their assigns, successors and interest a Non-Exclusive Easement for construction and restoration of the Access Road, such easement for the purposes of permitting access within the Access Road in connection with the construction, repair, and reconstruction from time to time of improvements of the Access Road and the Properties and for the purposes of installing, removing, re-installing, accessing, repairing, replacing or maintaining, at the sole cost and expense of the owner of the Benefited Property, (s), Service and Utility Lines in and under the Access Road to serve the Benefited Property (s).

(c) The owner of each of the Properties shall maintain, at its sole cost and expense, all Service and Utility Lines installed by the owner of each respective Property in or under the Access Road. The owners of each of the Properties are hereby granted an easement to enter the Access Road for the purpose of conducting such Maintenance.

Notwithstanding the foregoing, if the owner of any Property intentionally, willfully or negligently causes or permits any damage or destruction to any portion of the Access Road, said owner shall be solely and exclusively liable and responsible to immediately repair, maintain and replace all such damage and destruction in, on, over and under the Access Road at its sole and exclusive cost and expense.

(d) If any owner of a Property intends to cause any portion of the Access Road to be obstructed, damaged or destroyed in connection with its Easement for Construction and Restoration in the Access Road for the purpose of installing, removing, re-installing, accessing, repairing replacing or maintaining Service and Utility Lines in or under the

7

Access Road, such activity shall not commence until after prior written notice of the intention of said owner of a Property has been provided to the other owners of the Properties, if any, which notice shall be accompanied with (i) detailed plans prepared by a licensed engineer depicting and describing the proposed plan demonstrating how an anticipated interruption of traffic over and across the Access Road shall be handled in such a way as not to cause interference with the usual and customary access to and from the Properties, all of which shall be secured and implemented at the sole cost and expense of the owner of the Property proposing to conduct permitted work in or under the Access Road. The owner of the Property proposing to cause permitted work to be preformed in or under the Access Road, as aforesaid, shall use diligent and good faith efforts to commence and complete all permitted work in and under the Access Road expeditiously and minimize any interference with the ongoing free flow of traffic over and across the Access Road to and from each of the Properties on Wilson Avenue.

(e) The easements granted herein shall not be for any purpose other than the intended purpose stated herein and the Access Road shall not be changed or modified except as provided herein, in any respect whatsoever with the prior written consent of the owners of the Benefited Properties and the Burdened Properties, which consent may be withheld in such parties' sole discretion. Furthermore, notwithstanding the above, at no time shall the Access Road be blocked or otherwise obstructed to prevent the free flow of traffic or otherwise.

(f) The pro rata share of costs and expenses to "**MAINTAIN THE ACCESS ROAD**" shall be fairly and reasonably budgeted and/or determined from time to time by agreement of the owners of the easement.

2.2 <u>Easement for Drainage, Discharge and Detention.</u>

8

(a) The Agency and I.L.U.R. hereby grant to the owners of the property, their successor's and assigns, an easement in, on, over and under the access road to drain storm water, from each Benefited Property, over the surface of the Access Road and to lay, install, use, access, repair, maintain and replace from time to time therein, at the sole cost and expense of the each of the owners of the Benefited Properties, storm water conduits, if appropriate, together with the appropriate culverts and the pertinent improvements, if necessary, for the discharge of storm water drainage from the properties beneath the Access Road.

<div align="center">ARTICLE III</div>

<div align="center">IMPOSITIONS</div>

3.1 <u>Payment of Impositions.</u>

Each party will pay all Impositions on his property before any interest, penalty, fine or cost may be added for non-payment, and will furnish to the other parties, for inspection, within thirty days after written request, official receipts of the appropriate taxing authority or other proof satisfactory to the other parties, evidencing such payment. Each party will protect, defend, indemnify and hold the other harmless from and against all liabilities, obligations of claims, damages, penalties, causes of action, costs and expenses imposed upon or incurred upon or asserted against the indemnified party by reason of the indemnifying party's failure to pay any Impositions as required herein. If any Impositions are payable in installments, then said party may, at its election, make payments thereof in installments.

3.2 <u>Failure to Pay Impositions.</u>

If any party shall fail to pay any Imposition that is due in the fashion provided in Section 3.1 hereof and which such defaulting party is obligated to pay pursuant to this Article III or otherwise, if any lawful authority would thereafter have the right by reason

<div align="center">9</div>

of such non-payment to proceed by sale or foreclosure to transfer title to the Property from the defaulting party and such transfer would materially and adversely affect any non-defaulting parties ability to use its Property, then such non-defaulting party may, after ten days written notice to the defaulting party, pay such Imposition, together with any interests and penalties thereon, defaulting party shall upon demand, reimburse the non-defaulting party, the amount of such payment.  Such reimbursement shall, at the option of the non-defaulting party, be secured by a lien against the Property of the defaulting party in the manner set forth in Article 6 hereof.

<div align="center">

ARTICLE IV

INSURANCE, WAIVERS, INDEMNITIES
</div>

4.1      Insurance.

Each party shall maintain with respect to its respective Property, a policy of commercial General Liability Insurance, with specific coverage for premises/operations, independent contractors, broad form contractual liability insurance in support of the indemnities herein, broad form property damage and personal injury liability insurance on employee and contractual exclusions removed naming the other parties hereto as an additional insured without exclusion for the negligence of the issued insured and with cross liability and severability of interest endorsements.  Each such policy shall have a combined single limit of not less than $1 million dollars which minimum amount shall be adjusted as of each successive fifth anniversary of the date of this Agreement by five (5%) percent.

Not withstanding the foregoing, the Agency and any other governmental authority hereunder, shall have the right to self-insure as long as the self-insuring party is consistently able to meet its financial obligations as they mature.

<div align="center">10</div>

4.2 Indemnities.

Except as otherwise provided herein, each of the parties to this Agreement, agrees to indemnify and hold harmless ((including reasonable attorney's fees and court costs) the other parties, their employees, officers, directors, agents and contractors from all claims of any nature by third parties caused by the acts or omissions of the indemnifying party, its employees, officers, directors, agents and contractors and permittees arising out of the use or enjoyment by the indemnifying party of any easements granted hereunder or out of breach of this Agreement by the indemnifying party.

4.3     Evidence of Insurance.

Each party shall upon request by any other party hereof, provide copies of Certificates of Insurance issued by such parties insurance carriers (or such Certificates as are issued pursuant to statutorily permit self-insurance regulations) evidencing the existence of policies in force (or self-insurance) complying with the provisions hereof and shall provide copies of replacement and/or renewal Certificates as the coverage renews.

## ARTICLE V

## CONDEMNATION

5.1     Condemnation.

(a)     In the event of a total and permanent Taking of all of the Easement Areas, this Agreement shall terminate.

(b)     If all or any portion of an Easement Area is taken and if such Taking results in a material impairment in the use or enjoyment of any easement granted under this agreement which burdens the Property so Taken, the Burdened Party shall, as promptly as is reasonably practicable, at the cost and expense of the Burdened Party,

11

restore or repair the improvements located in or on such Easement Area, or erect substitute improvements, with the result that the Benefited Party shall have substantially the same use and enjoyment of such easement as the Benefited Party enjoyed prior to such Taking, subject to non-material relocations or alterations as may be necessary to accommodate changed circumstances and the reasonable reconstruction objectives of the Burdened Party; provided, however, that if such restoration, repair or the erection of substitute improvements is impossible, unlawful or infeasible due to changed dimensions or configuration of the Property(s) and/or as a result of such Taking, the parties agree to negotiate in good faith to establish new easements or other accommodations to restore to the Benefited Party, to the extent practicable, the benefits of the easements lost due to such Taking. All construction, restoration and repair activities as permitted or required under this Subsection shall be undertaken and completed diligently and in compliance with the provisions of Article 2 herein. Notwithstanding the foregoing, the Burdened Party shall have no duty to repair or restore any paving, conduit, culverts, equipment or fixtures of the Benefited Party that were located within the Easement Area of such easement, all of which repair or restoration shall be the responsibility of the Benefited Party, at its cost and expense.

(c)     In the event of a Taking of all or part of any Easement Area, each Benefited Party with respect to such easement shall be entitled to receive its Proportionate Share of any award or damages resulting from such Taking. For purposes of this Subsection, "Proportionate Share" shall mean the relative value of each party's interest or estate (including easements) in the Property so Taken as determined in a manner mutually and reasonably acceptable to each party.

12

ARTICLE VI

DEFAULT AND REMEDIES

6.1     Non-Monetary Default.

If any party to this Agreement violates any covenant set forth in this Agreement other than for the payment of any sum owed to another party and such violation or failure continues for 30 days after receipt of written notice thereof from any non-defaulting party, a non-defaulting party shall have the right, but not the obligation, to perform such covenant on behalf of the defaulting party (including the right of the non-defaulting party or its contractors to enter onto the Property of the defaulting party and perform the work, repairs or maintenance as may be called for under this Agreement) and any sums expended to effect such cure shall become immediately due and payable from the defaulting party to the non-defaulting and shall be subject to the provisions of Section 6.2 below. Notwithstanding the foregoing, (i) if such violation or failure is not susceptible of being cured or corrected within the aforesaid 30 day period, then if defaulting party shall have commenced such cure within the aforesaid 30 day period and diligently and continuously prosecutes same to completion, the defaulting party shall have such additional time as it may reasonably require to complete such cure and (ii) if such violation or failure presents a threat to life or safety or prevents a party from using an easement granted hereunder (such as, by way of example, and not limitation, the failure to timely remove snow from the Access Road), then the non-defaulting party faced with such threat shall have the immediate right to correct such violation of failure (and to be reimbursed by the defaulting party for the sums expended to effect such cure) and, in such case, the non-defaulting party

13

shall provide such notice to the defaulting party as shall be reasonable under the circumstances.

6.2 Defaults; Liens.

If at any time any party to this Agreement shall fail, upon demand, to pay to any other party (hereafter in this Article referred to as the "creditor party" any sum of money payable to the creditor party pursuant to the provisions of this Agreement, then, in addition to any rights of subrogation which the creditor party may have by operation of law, the money owed, together with interest accruing at the Default Rate and costs of collection thereof, including reasonable attorney's fees, shall be a charge on and shall be a continuing lien upon the Property of the defaulting party and shall also be the continuing personal obligation of the defaulting party.  Such charge may be enforced by suit by the creditor party in any form of action now or hereafter recognized in the State of New Jersey, including, without limitation, in an action to foreclose the lien against the Property of the defaulting party in like manner as a foreclosure of a mortgage on real property and/or a suit on the personal obligation against the defaulting party, which action shall be indexed by the Clerk of Essex County at the request of the plaintiff therein as a lis pendens and there shall be added to the amount owed the costs of preparing and filing the complaint in such action (including reasonable attorney's fees), and in the event a judgment is obtained, such judgment shall include interest at the Prime Rate plus five (5%) percent, and reasonable attorney's fees to be fixed by the court, together with the costs of the action.

6.3 Priority of Lien.

Any lien imposed by the provisions of this Article shall relate back to and take its priority from the date of recording of this Agreement, except that such

14

lien shall be subordinate to the lien of any Protected Mortgage if such Protected Mortgage shall have been recorded prior to the entry of judgment or the filing of a lis pendens with respect to sums owing hereunder and delinquent. Sale or transfer of any Property shall not affect the lien. However, the sale or transfer of any Property pursuant to foreclosure of a Protected Mortgage, execution upon a judgment entered on an obligation secured by the Protected Mortgage or any proceeding in lieu thereof, shall extinguish any such lien except for any such lien entered as a judgment or docketed lis pendens at the time such mortgage was recorded, but the creditor party shall be entitled to participate in distribution of the proceeds of any foreclosure in accordance with the general rules regarding tights of subordinate lien creditors. Nothing herein is intended to cause the divestiture of a Protected Mortgage upon the occurrence of a judicial sale in execution upon a lien junior to such Protected Mortgage.

6.4 <u>Enforcement and Assignment of Liens.</u>

A person holding a Protected Mortgage upon any Property shall have the right to receive an assignment of any lien affecting such Property arising pursuant to Section 6.2 hereafter upon payment of the amount secured by such lien , in accordance with the provisions hereafter set forth in this Section 6.3. Such mortgage shall give to the holder of such lien a written notice offering to purchase the same, which notice shall set forth a date and time of settlement in Newark, New Jersey. On the date of such settlement, the holder of such lien shall deliver to such mortgage an instrument in recordable form assigning such lien, together with the debt secured thereby, upon payment by such mortgage of the full amount, including interest, secured by such lien.

6.4 <u>Liens Survive Termination.</u>

15

Notwithstanding any termination of this Agreement: (i) any charge or lien which shall theretofore have arisen pursuant to Section 6.2 hereof shall remain in full force and effect until the amount secured thereby shall be paid in full (ii) the interest provided for in Section 6.2 hereof shall continue to accrue thereon; and (iii) such charge or lien shall be fully enforceable by the holder thereof.

6.5  No Waiver.

No delay or omission of any party to this Agreement in the exercise of any right accruing upon any default of any party shall be deemed to impair any right or be construed to be a waiver thereof and every such right may be exercised at any time during the continuance of such default.  A waiver by one party of a breach or a default of any of the terms or conditions of this Agreement by any other party shall not be construed to be a waiver of any subsequent breach or default of the same or of any other provision of this Agreement.  Except as otherwise specifically provided in this Agreement, no remedy provided in this Agreement shall be exclusive, but each shall be cumulative with all other remedies provided in this Agreement and at law or equity.  No breach of the provisions of this Agreement, but such limitation shall not affect, in any manner, any other rights or remedies which any other party may have hereunder, by reason of any breach of the provisions of this Agreement.  This provision of this Agreement shall be binding upon and effective against any party, including, without limitation, any party whose title is acquired by foreclosure, trustee's sale, tax sale or deed in lieu of foreclosure.

6.6  Certification.

Each party hereunder shall within 15 days following a written request by any other party (the "Requesting Party"), certify to the Requesting Party, and to such

16

additional parties as the Requesting Party may designate, whether such certifying party holds any lien on the Property of the Requesting Party, whether it has delivered any notice of default hereunder to such Requesting Party and any other matter relating to the status of matters under this Agreement as may be reasonably requested by the Requesting Party.

<div align="center">

ARTICLE VII

NOTICES

</div>

7.1 Notices.

Any notice which may or is required to be given hereunder shall be in writing and shall be (i) transmitted by postage prepaid registered or certified U.S. mail, return receipt requested, (ii) delivered in person against a signed receipt, (iii) transmitted by facsimile (with a complete copy to also be delivered simultaneously pursuant to (iv) below) or (iv) delivered, however, that upon giving such notice the party giving notice shall use reasonable efforts to advise the others by telephone that a notice has been sent hereunder. Such telephonic advice shall not, however, be a condition to the effectiveness of notice hereunder. Except as other specified herein, all notices and other communication shall be deemed to have been duly given when received as evidenced by return receipt, overnight messenger receipt or by evidence of completed transmission if transmitted by facsimile, whichever shall first occur. Rejection or refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice, deemed or request sent. Any party may change its address for purposes hereof by notice given to the other of its new address.

Notices hereunder shall be directed to the owner of the Properties as follows:

if to Block Lots 92.02 & 69.01         Industry Land Urban Renewal Inc.
                                        c/o Giantomassi & Olivera
                                        292 Lafayette Street
                                        Newark, New Jersey 07105

<div align="center">17</div>

Attn.: Francis Giantomassi, Esq.

with a copy to:                        Any successor or assigns of record

if to Block 5020 Lots 69.03, 69.02    Newark Redevelopment & Housing Authority
            69.04, 69.05, 69.06       500 Broad Street
                                       Newark, New Jersey 07102

with a copy to:                        c/o General Counsel
                                       Newark Redevelopment & Housing Authority
                                       500 Broad Street
                                       Newark, New Jersey 07102

## ARTICLE VIII

## <u>MISCELLANEOUS</u>

8.1 <u>Force Majeure.</u>

The performance of any obligation or undertaking provided for in this agreement, other than the payment of money shall be excused and no default shall be deemed to exist in the event, and to the extent that, the performance of any such obligation is prevented, delayed, retarded or hindered by an act of God, fire, earthquake, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, terrorism, sabotage, inability to procure or general shortage of materials or supplies in the open market (for reasons other than price or failure to order in a timely manner), strike, lockouts, unforeseen field conditions, action of labor unions, condemnation, laws, orders of government authorities, or any other cause similar to the foregoing and not within the reasonable control of the party obligated to perform the same.

8.2  Entire Agreement; Governing Law.

This Agreement contains and constitutes the entire agreement of the parties with respect to the subject matter which it covers; supercedes all prior or other negotiations, representations, understandings and agreements of, by or among the parties, which are fully merged herein; and shall be governed by and construed under the laws of the State of New Jersey.

8.3  Partial Invalidity.

If any term, covenant or condition of this Agreement shall be invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby; and each term, covenant and condition of this Agreement shall be valid and shall be enforced to the extent permitted by law.

8.4  Captions and Interpretations.

The captions in this Agreement are inserted for convenience of reference only; and in no way define, describe or limit the scope or intent of this Agreement or any provision hereof.  No rules of construction against the drafter of this Agreement shall apply in any interpretation or enforcement of this Agreement, any document or certificates pursuant hereto, or any provisions of the foregoing.

8.5  Successors and Assigns.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their respective successors and assigns, and equitable and legal owners of each Property, and shall be deemed a covenant running with the land.  An owner of a Property shall be deemed to include the Permittees of the legal and equitable owner of each Property.

8.6  Rules of Interpretation.

19

This Agreement shall not be strictly construed against any of the parties hereto. Except as otherwise expressly provided in this Agreement, the singular includes the plural and the plural includes singular; "or" is not exclusive. A reference to an agreement or contract includes supplements and amendments thereto to the extent permitted by this Agreement. The reference to any law, ordinance, statute or governmental regulation includes any amendment or supplement thereto. A reference to any party includes its permitted successors and assigns.

8.7  Time Periods.

In computing any period of time pursuant to this Agreement , the day of the act or event from which the designated period of time will run shall not be included. Any time period provided in this Agreement which shall end on a Saturday, Sunday or holiday shall extend to the next full business day. The term "business day" shall mean any day which is not a Saturday, Sunday or holiday. The term "holiday" shall mean a day other than a Saturday or Sunday on which banks in the State of New Jersey are or may elect to be closed.

8.8  Further Assurances.

Each party shall from time to time execute, acknowledge and deliver, for no further consideration but at the cost of the requesting party, all documents and instruments as the other party may reasonably request to further evidence or effectuate the purposes of this Agreement.

8.9  Safety Measures/Compliance With Laws.

In connection with any construction or renovation work performed by a party in or on an Easement Area, each party shall take, and cause its respective contractors and other Permittees to take, all safety measures reasonably required to protect the other party and its Permittees from injury or damage caused by or resulting from such construction or

20

renovation(r) Each party shall cause its construction or renovation work to be completed in a good and workmanlike manner in accordance with good construction practices and all applicable laws, ordinances, rules and regulations.

8.10 Mechanic's Lien.

Each party hereunder that owns a Burdened Property shall keep such Property free and clear of mechanic's, materialmen's and stop notices and other similar liens filed by reason of work, labor, services or materials supplied or claimed to have been supplied in connection with any work performed by or on behalf of such party, and such party shall pay and discharge when due any and all lawful claims upon which such lien may or could be based. If any such liens shall at any time be filed, the party commissioning the labor or materials giving rise to such liens (the "Responsible Party") shall, within sixty (60) days after notice of the filing thereof, cause such liens to be discharged of record by payment, deposit, bond or order of court of competent jurisdiction r otherwise. Each party shall indemnify, defend and hold each other party harmless of and from any and all such liens and suits or other proceedings pertaining thereto for which such indemnifying party would be deemed a Responsible Party under the preceding sentence.

8.11 Effect of Agreement.

This Agreement does not and shall not be construed as creating a joint venture, partnership, agency, fiduciary or any other relationship among or between the parties hereto.

8.12 Recording.

This Agreement shall be filed in the land records of the County of Essex, New Jersey, promptly after the execution, acknowledgement and delivery hereof by all parties hereto. The cost of such filing shall be borne by the owner of the Redeveloper Property.

21

8.13  No Merger.

Each of the easements created by this Agreement and title to the Property burdened thereby shall not merge, but shall remain separate and distinct notwithstanding the acquisition of both the Burdened Property and the Benefited Property respecting any such easement by the same person or entity, or its affiliates, or by any mortgage, or by any other party.

8.14  Easement Rights Not Limited as to Use of Benefited Properties.

Neither the right of a Benefited Party to use and enjoy any easement created herein, nor permitted volume of usage or traffic therein and thereon, shall be limited or restricted based on the use from time to time of such Benefited Property or the nature of the improvements form time to time located thereon, notwithstanding any prior use or non-use of the benefited Property, any prior volume of usage or traffic therein or thereon or any proposed use of a Benefited Property referenced in this Agreement.

8.15  Ownership of Fixtures.

Any conduits, pipes, or other fixtures or equipments installed in any Easement area by or for the benefit of a Benefited Party shall belong to and be the property of such Benefited Party.

8.16  Easements Run With the Land.

The easements granted herein shall be perpetual, shall run with the land, and shall bind, and inure to the benefit of, the parties hereto and their successors and assigns in equitable and legal title.  The easements granted herein shall not be amended, revised or otherwise changed without prior written consent of the parties who benefit hereby which consent may be withheld in their sole discretion.

8.17  Creation of Superior Rights.

22

The rights granted in this Easement Agreement, and the agreements contained in this Easement Agreement, are intended to be and shall be superior in all respects to all other agreement, rights and understandings now existing or to be created which affect all or any portion or the Industry Land tract except to the extent this Easement Agreement is amended by the parties hereto in writing. The terms and conditions of this Easement Agreement are intended to and shall supercede and prevail over any inconsistent or different terms and conditions contained in any other agreement or document to which any party hereto or joining in this easement Agreement is a party, whether recorded or otherwise.

8.18  Warranty of Title.

Each party represents and warrants to the other that its respective Property is not encumbered by any mortgage except those with respect to which the holders have joined on to this Agreement on the separate joinder pages attached hereto.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

Newark Redevelopment and Housing Authority

_____          By: _____
Witness        ELIO R. MENA
        AN ATTORNEY AT LAW IN NEW JERSEY
_____6/23/05_____          _____6/23/05_____
Date                                        Date


Industry Land Urban Renewal Corporation


_____          By: _____
Witness

_____          _____
Date                                        Date



**Industry Land Urban Renewal Corporation**

By: _____

_____
Witness Francis J. Giantomasi, Esq. Rosalie Devino, As court-appointed
                                    Co-Guardian for Richard Devino

6/18/09
_____
Date

By: _____

_____
Witness Francis J. Giantomasi, Esq. Peter Devino, As court-appointed
                                    Co-Guardian for Richard Devino

6/18/09
_____
Date

**RECORD AND RETURN TO:**
Elio R. Mena, Esq.
Housing Authority of the City of Newark
500 Broad Street, 6th Floor
Newark. NJ 07102

25

## EXHIBIT A

### Description of 60' wide
### Private Roadway
### Through Lots 92.02, 69.01, 69.03-69.06 Block 5020
### City of Newark
### Essex County, New Jersey

Beginning at a point in the northwesterly sideline of Hyatt Avenue, distant 169.61 feet from the intersection of the northeasterly sideline of Hyatt Avenue with the northwesterly sideline of Wilson Avenue, thence:

1.  Along the westerly line of lot 92.02 bl 5020, the arc of a curve to the left whose radius is 478.00 feet a central angle of 23°34'22" a distance of 196.66 feet to a point, said curve having a chord distance of 195.28 feet along a chord bearing of N 44°54'00" E;

2.  Still along said line N 33°06'49" E a distance of 848.38 feet to a point in lot 69.01 bl 5020;

3.  Through lot 69.01 bl 5020, the arc of a curve to the left whose radius is 470.00 feet a Central angle of 16°02'42" a distance of 131.62 feet to a point;

4.  Still through said lot N 17°04'07" E a distance of 46.24 feet to a point in lot 69.03 bl 5020;

5.  Through lot 69.03, along the arc of a curve to the right whose radius is 120.00 feet a central angle of 50°08'02" a distance of 105.00 feet to a point, said curve having a chord distance of 101.68 feet along a chord bearing North 42°08'08" East;

6.  Still through lot 69.03 North 67°12'09" East, a distance of 30.50 feet to a point;

7.  Still through said lot along the arc of a curve to the left whose radius if 60.00 feet a central angle of 48°15'51" a distance of 50.54 feet to a point;

8.  Still through lot 69.03 and along the westerly line of a said 60 feet wide private roadway North 18°56'18" East a distance of 943.79 feet to a point in lot 69.05;

9.  Through said lot along the arc of a curve to the left whose radius is 7.00 feet a central angle of 90°45'51" a distance of 11.09 feet to a point;

10. Still through lot 69.05 the arc of a curve to the right whose radius is 68.00 feet a central angle of 271°02'53" a distance of 321.69 feet to a point in lot 69.06;

11.    Still through said lot and along the easterly line of said proposed 60 feet wide private roadway South 18°56'18" West a distance of 1,018.45 feet to a point in lot 69.03;

12.    Through said lot the arc of a curve to the right whose radius is 120.00 feet a central angle of 48°15'51" a distance of 101.08 feet to a point;

13.    Still through said lot South 67°12'09" West a distance of 30.50 feet to a point;

14.    Still through said lot the arc of a curve to the left whose radius is 60.00 feet a central angle of 50°08'02" a distance of 52.50 feet to a point;

15.    Still through said lot South 17°04'07" West a distance of 46.25 feet to the point in lot 69.01 bl 5020;

16.    Through lot 69.01 bl 5020, the arc of a curve to the right whose radius is 530.00 feet a central angle of 16°02'42" a distance of 148.42 feet to a point;

17.    Still through said lot and lot 92.02 bl 5020, S 33°06'49" W a distance of 848.38 feet to a point on the easterly line of lot 92.02 bl 5020;

18.    Along the easterly line of lot 92.02 bl 5020, the arc of a curve to the right whose radius is 538.00 feet a central angle of 19°09'38" a distance of 179.92 feet to a point in the northeasterly line of Hyatt Avenue, said curve having a chord distance of 179.08 feet along a chord bearing of S 42°41'38" W;

19.    Along said sideline N 68°38'11" W a distance of 71.58 feet to the point of beginning.

This description is in accordance with an "After Subdivision Map" of Industrial River Project, lot 69.02 block 5020, City of Newark, Essex County, N.J.

**Description of 30' wide**
**Access Easement**
**Lot 69.03 Block 5020**
**City of Newark**
**Essex County, New Jersey**

Beginning at the terminus of the 5th course of a deed from Richard Barone, single and Patricia and Gregory L. Renner to the Housing Authority of the City of Newark, dated Aug. 14, 1978 and recorded in deed book 4614 Page 96 & c, thence:

1.   Through lo 69.03 North 40°54'30" East a distance of 142.80 feet to a point on the southerly line of lot 69.04 block 5020, as it is shown on an "After Subdivision Map" of Industrial River Project, lot 69.02 Block 5020, City of Newark, Essex County, N.J., prepared by Professional Planning and Engineering Corporation, Cedar Knolls, N.J.;

2.   Along the southerly line of lot 69.04 South 71°03'42" East, a distance of 32.35 feet to a point;

3.   Through lot 69.03 South 40°54'30" West, a distance of 154.90 feet to a point in the 5[th] course of the above referenced deed;

4.   Along said course North 49°05'30" West, a distance of 30.00 feet to a point of beginning.





GRESS & EGRESS)
THE CITY OF NEWARK
DUSTRIAL RIVER URBAN
S AND BOUNDS SURVEY OF
5020 LOTS 72 & 108
0 & PRONTESTI ENGINEERS
RECORDED IN A DEED FROM
RITY OF THE CITY OF NEWARK
N DB3608/040 DATED 12/01/1958.

30' WIDE EASEMENT
(INGRESS & EGRESS)

LOT 69.02 BLOCK 5020
1,313,977 S.F. = 30.165 AC.
Formerly known as Disposal Parcel no. 48BR

FILL PILE
30' WIDE GAS-EAS
PER LEASE AGREE
DB1806-284

PAVEMENT UNDER
FILL PILE

WATER SERVICE
DEMOLISHED BLDG.

0
EWAL, INC.
el no. 48AR

N 71°03'42" W
915.70'

LOT 69.03
353,861 S.F. = 8.124 AC.

S 71°03'42" E
810.03'

N 71°03'42" W
810.03'

LOT 69.8
261,360 S.F. =

60' WIDE ACCESS
EASEMENT FOR PRIVATE
ROADWAY

L=131.62
R=470.00
Delta=16°02'42"

N 17°04'07" E 46.24'

L=105.00
R=120.00
Delta=50°08'02"
CHD=101.68'

L=148.42
R=530.00
Delta=16°02'42"

L=52.50
R=60.00
Delta=50°08'02"
CHD=50.84'

S 17°04'07" W 44.29'

N 17°04'07" E
60.03'

L=50.54
R=60.0'
Delta=48°15'51"
CHD=49.06'

252.96

HYATT LA
PROPOSED PRIVAT
DEDICATED TO THE CI

L=101.08'
R=120.00
Delta=48°12'
CHD=98.12'

252.90

S 16°54'19" W

387.18'

100.6

353.60

S 16°54'19" W

N 68°09'30
L=214692